# In the
# United States Court of Appeals
## For the Second Circuit

_____

August Term, 2014

No. 14-239-cr

UNITED STATES OF AMERICA,
*Appellee*,

v.

JAYQUIS BROCK, MARK BASKERVILLE, RUSSELL BATTLES, STEPHANIE D'AGOSTINO, SHERROD DANIELS, LARRY LEVORE, HARRY DIAZ, STEVEN DICKS, DERRON DOCKERY, DEVANTE FORTUNE, MAURICE HILL, SHAMAINE HOBBY, EDMUND JACKSON, SR., JAMES JENKINS, MILTON JOHNSON, TORRENCE JONES, DEMETRIUS LITTLE, KRISTIN LONGOBARDI, ERIC LUMPKIN, WENDEL MCDUFFIE, RYAN MOORE, JAVON MORNING, GEMINI NAPOLEON, CHARLES NICHOLS, RAYMOND RICE, CHANEL SINCLAIR, ROGER SULLIVAN, ELEAZAR THOMPSON, TYLAN THOMPSON, ALVIN TOWNSEND, RONNIE WASHINGTON, TYRONE WILLIAMS, DARREN WINFRY, AARON MOORE, MANOKUS FIELDS, BRANDON TOLSON, JOSEPH JACKSON,
*Defendants*,

JAMES DICKERSON
*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the District of Connecticut.
No. 3:10-cr-227 (EBB) — Ellen Bree Burns, *Judge*.

No. 14-239-cr

_____

Argued: December 17, 2014
Decided: June 3, 2015

_____

Before: WINTER, JACOBS, and PARKER, *Circuit Judges*.

_____

Defendant-Appellant James Dickerson appeals from a judgment of conviction in the United States District Court for the District of Connecticut (Ellen Bree Burns, *Judge*) for conspiracy to distribute and to possess with intent to distribute crack cocaine, in violation of 21 U.S.C. §§ 841 and 846, and distribution of crack cocaine, in violation of 21 U.S.C. § 841. Because we find that there was insufficient evidence on which a jury could convict Dickerson on the conspiracy count, we **REVERSE** the conviction for conspiracy and **REMAND** for resentencing on the distribution count alone.

_____

JEREMIAH DONOVAN, Old Saybrook, CT, *for Defendant-Appellant James Dickerson*.

ROBERT M. SPECTOR (Marc H. Silverman, *on the brief)*, Assistant United States Attorneys *for* Deirdre M. Daly, United States Attorney for the District of Connecticut, *for Appellee.*

_____

BARRINGTON D. PARKER, *Circuit Judge*:

In April 2012, James Dickerson was indicted along with thirty-seven other defendants and charged in two counts – conspiracy to distribute and to possess with intent to distribute 28 grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846, and distribution of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(c). Following a four day trial, Dickerson was convicted on both counts and sentenced to 168 months, to run concurrently. On appeal, Dickerson challenges his conviction on the conspiracy, but not the substantive distribution count. As to the conspiracy conviction, we agree with Dickerson that the evidence establishes no more than his role as a mere purchaser from the conspiracy and cannot support an inference that he joined it. Consequently, we do not address his alternative argument for a new trial as to that count on the basis that a juror committed misconduct during deliberations by accessing a dictionary definition of the word "conspiracy".

The indictment targeted a drug distribution conspiracy based in the Newhallville neighborhood on the border of New Haven and Hamden, Connecticut. Joseph Jackson, the leader of the organization, employed several lieutenants, including his nephew Jayquis Brock, to distribute crack cocaine to purchasers. Brock ultimately pled guilty and testified for the prosecution pursuant to a cooperation agreement. Brock testified that he typically sold 18 "eight-balls" (each weighing approximately 3.5 grams) of crack cocaine per day at $140-150 each. Jackson allowed Brock to keep the money he earned for every ninth eight-ball he sold.

According to Brock, Dickerson was one of his regular buyers, and had been an existing customer at the time Brock joined Jackson's

organization in July 2010.  Dickerson typically purchased two eight-balls at a time, on several days each week, and occasionally more than once per day.  Dickerson contacted Brock by calling his "dispatch" phone, which was a cell phone issued by Jackson to Brock on which purchasers could contact Brock to set up transactions. The government obtained warrants to intercept calls on the dispatch telephone and captured numerous calls between Dickerson and Brock, as well as several calls between Dickerson and Jackson. Telephone records introduced at trial showed that Dickerson contacted Brock or Jackson 129 times between June and September 2010.  Of these contacts, the government introduced 31 recorded calls, all but two of which were between Dickerson and Brock.  On cross-examination, Brock testified that he did not have resale agreements with his customers and, consequently, did not know or care what they did with the drugs after he sold them. Brock further testified that he did not consider Dickerson to be a member of Jackson's drug trafficking organization, although he did consider Dickerson to be a "reliable customer."

In October 2010, Dickerson was captured on video selling an eight-ball and eight $20 baggies of crack cocaine to an undercover officer, which formed the basis for the substantive distribution count in the indictment.  In November 2010, Dickerson was arrested. Shortly thereafter, he met with a law enforcement agent and his attorney, and admitted that he purchased crack cocaine from Brock and others, broke down each eight-ball, and resold it in $20 baggies.

Dickerson's defense at trial to the conspiracy count was that he was a mere buyer of drugs and not a participant in the conspiracy. At the close of the prosecution's case in chief, Dickerson moved on this ground for a judgment of acquittal as to the conspiracy count.  Dickerson contended that he never joined the

conspiracy and was only one of its numerous customers, highlighting the fact that Brock himself testified that he viewed Dickerson as a customer and not a member of the organization.

The district court denied the motion, concluding that the government had adduced sufficient evidence that Dickerson was a member of the conspiracy. The district court held that, although the "transactions between Dickerson and Brock are by themselves insufficient to constitute the charged conspiracy . . . . other evidence presented at trial was sufficient to permit the jury to conclude beyond a reasonable doubt that Dickerson knew of the Jackson group's drug distribution scheme and agreed to join and participate in it." JA 111.

Specifically, the district court noted that the government had proved that Dickerson purchased and resold drugs in wholesale quantities on a regular basis over a period of at least a month from Brock and that Dickerson's post-arrest statements indicated that he knew Brock worked for Jackson and that the two were moving large quantities of drugs on a daily basis. These facts, according to the district court, permitted the jury to conclude that "Dickerson had not merely engaged in spot transactions with Brock" but that the two had developed an expectation of future sales such that "each side had an interest in the other's future drug-related endeavors – *i.e.*, Dickerson's interest in the continued supply of [crack] by Brock, and Brock's interest in Dickerson's continued demand for them." JA 113. This appeal followed.

## DISCUSSION

"As a general matter, a defendant challenging the sufficiency of the evidence bears a heavy burden, as the standard of review is exceedingly deferential." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (internal citations and quotation marks omitted). Specifically, we "must view the evidence in the light most favorable to the Government, crediting every inference that could have been drawn in the Government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *Id*. (citing *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008)). "Although sufficiency review is *de novo*, we will uphold the judgments of conviction if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id*. (citing *United States v. Yannotti*, 541 F.3d 112, 120 (2d Cir. 2008); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Our precedent is clear that the mere purchase and sale of drugs does not, without more, amount to a conspiracy to distribute narcotics. *See United States v. Parker*, 554 F.3d 230, 234 (2d Cir. 2009). "[T]he buyer's agreement to buy from the seller and the seller's agreement to sell to the buyer cannot 'be the conspiracy to distribute, for it has no separate criminal object.'" *Id.* at 235 (quoting *United States v. Wexler*, 522 F.3d 194, 208 (2d Cir. 2008) (internal alterations omitted)). We have explained that, although the mere buyer defense "does not protect either the seller or buyer from a charge they conspired together to transfer drugs if the evidence supports a finding that they shared a conspiratorial purpose to advance other transfers, whether by the seller or by the buyer," *id.* at 234, "[e]vidence that a buyer intends to resell the product instead of personally consuming it does not necessarily establish that the buyer has joined the seller's distribution conspiracy," *United States v.*

6

*Hawkins*, 547 F.3d 66, 74 (2d Cir. 2008). Nor is "contact with drug traffickers," standing alone, sufficient "to prove participation in a conspiracy." *United States v. Gaviria*, 740 F.2d 174, 184 (1984). Although we have "avoided listing factors to guide what is a highly-specific fact inquiry into whether the circumstances surrounding a buyer-seller relationship establish an agreement to participate in a distribution conspiracy," we have identified certain factors relevant to the analysis, including "whether there was a prolonged cooperation between the parties, a level of mutual trust, standardized dealings, sales on credit [], and the quantity of drugs involved." *Hawkins*, 547 F.3d at 74 (internal citations and quotation marks omitted).

Here, there is insufficient evidence of a shared conspiratorial purpose among Jackson, Brock and Dickerson. While Dickerson frequently bought crack from Brock, he also purchased crack from others not involved in the Jackson organization. Brock and Jackson never sold crack to Dickerson on credit, and placed no limitations on Dickerson's ability to use or resell the product he purchased. Brock testified that he did not consider Dickerson to be a member of the organization and did not know or care what Dickerson did with the drugs after he purchased them. There was no evidence that Dickerson shared profits with Brock or any other members of the organization, that Dickerson had interactions with Jackson or Brock other than the transactions that made him a customer, or that, apart from being a customer, he assisted their operation in any capacity.

This evidence is far weaker than the evidence in previous cases where we affirmed convictions despite a mere buyer defense. *See, e.g., United States v. Rojas*, 617 F.3d 669, 672, 675-76 (2d Cir. 2010) (the seller testified that he had a "longstanding" relationship with the buyer, provided the buyer with bail money because the buyer

"was moving product" for him, and sold drugs to the buyer on credit because he knew that the buyer would resell a portion of the drugs); *Parker*, 554 F.3d at 239 (unrebutted evidence that a buyer recruited his roommate to help the selling organization "handle one of the drug-order phone lines" while himself making deliveries for the selling group, and that another buyer purchased crack on credit and facilitated resales of crack in smaller quantities than the selling organization usually transacted in); *Hawkins*, 547 F.3d at 75 (testimony that the buyer "repeatedly brought potential customers' needs" to the seller's attention, and that he purchased drugs on credit with the understanding that he would resell the drugs and use the profits to repay the seller). In each of these cases, significant indicia of a conspiratorial purpose existed: the defendants purchased drugs in significant quantities on credit from the selling organization and took substantial other steps to assist it such as facilitating resales, supplying bail money and recruiting other customers and sellers.

The government, however, contends that our precedent permits juries to infer a conspiratorial agreement between the seller and the buyer on the basis of the volume and frequency of drug transactions. *See* Gov't Br. 41-46; *see also Parker*, 554 F.3d at 239 ("All three appellants purchased with such frequency and such quantity from the selling group to support a finding that each of them depended on it as a source of supply and thus had a stake in the group's success. . . . "); *Hawkins*, 547 F.3d at 77 ("In some cases, a large drug quantity may, in addition to establishing an intent to redistribute, support inferences about the relationship between the participants").

It is certainly true that the volume and frequency of transactions between Dickerson and the Jackson organization is

significant, and could have, under certain circumstances permitted an inference of conspiratorial intent. For example, in a footnote in *Parker*, we upheld a conspiracy conviction of a defendant without evidence that he "furnished . . . additional support to the selling group" because "his repeated purchases in wholesale quantities gave him a stake in the success" of the drug selling organization. 554 F.3d at 239 n.6. However, that individual is differently situated than Dickerson. The trial evidence in *Parker* established that this buyer never used crack cocaine and resold *all* of the drugs that he purchased from multiple members of the selling organization, which, in combination with the volume of sales, permitted the inference that he was closely aligned with the success of the enterprise. *See United States v. Parker, et. al.*, No. 05-cr-529, Transcript of Oral Argument on Rule 29 Motion, at 17 (N.D.N.Y. Dec. 8, 2006). In contrast, Dickerson had no connection to the Jackson enterprise, other than using Brock as one of the "various" suppliers of crack cocaine for both Dickerson's personal use and resale. Further there was evidence that the Jackson organization as a whole, and Brock specifically, sold to many different buyers. Brock's trial testimony established that Dickerson was one of his forty regular customers, that Brock had no interest in what Dickerson did with the drugs, and that he saw Dickerson only as a customer.

Viewing the evidence as a whole, we find the volume and frequency of *these* transactions to be insufficient to move the Brock-Dickerson relationship beyond that of buyer-seller because these circumstances do not create the inference of mutual dependency we identified in *Parker*. If, for example, Dickerson operated a food truck and purchased fifty loaves of bread at five different supermarkets, each of which sold bread to fifty different food truck operators on a daily basis, those purchases and his subsequent resales of the bread

would simply make him a good customer, not a member of any single supermarket enterprise. Although the volume of purchases is high, neither the food truck operator nor the supermarket is dependent on each other. By the same token, a good customer – even a very good customer – of a drug organization may still be just a customer, not a co-conspirator, if the evidence cannot support an inference of mutual dependency or a common stake.

"To sustain a conspiracy conviction, the government must present some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2004). We conclude that the evidence was insufficient to permit any rational juror to infer that Dickerson knowingly joined or participated in the charged conspiracy.

## CONCLUSION

For these reasons, we **REVERSE** Dickerson's conviction for conspiracy to distribute and to possess with intent to distribute. Because Dickerson's 168 month sentence was driven largely by the drug weight charged in the conspiracy, we also **VACATE** Dickerson's sentence and **REMAND** for resentencing on the substantive distribution count alone.